[PUBLISH]

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT
_____

No. 18-14687
_____

D.C. Docket No. 4:16-cv-01604-ACA

KIMBERLIE MICHELLE DURHAM,

Plaintiff-Appellant,

versus

RURAL/METRO CORPORATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(April 17, 2020)

Before ED CARNES, Chief Judge, and ROSENBAUM and BOGGS,[*] Circuit Judges.

PER CURIAM:

_____

[*] The Honorable Danny J. Boggs, United States Circuit Judge for the Sixth Circuit, sitting by designation.

The Pregnancy Discrimination Act commands that pregnant women "be treated the same . . . as other persons not so affected but similar in their ability or inability to work[.]"  42 U.S.C. § 2000e.  Five years ago, in *Young v. United Parcel Service*, 575 U.S. 206 (2015), the Supreme Court addressed anew the doctrine courts are to use to assess indirect evidence of intentional discrimination in violation of the PDA.  This case presents a question of first impression as to how to implement the *Young* test.

Plaintiff-Appellant Kimberlie Durham's job as an emergency medical technician ("EMT") for Defendant-Appellee Rural/Metro Corporation ("Rural") required her to lift 100 pounds regularly.  So when Durham's physician advised her to refrain from lifting more than 50 pounds while she was pregnant, Durham asked Rural for a temporary light-duty or dispatcher assignment for the duration of her pregnancy.  Rural had provided these same accommodations to other EMTs who had suffered injuries on the job and were restricted to lifting no more than 10 or 20 pounds as a result.  On the other hand, Rural had a policy of not granting such accommodations to employees who had been injured off the job.  Rural also had a policy that allowed it to accommodate those with disabilities on a case-by-case basis.

Rural declined Durham's request for accommodation, and Durham filed suit, alleging discrimination under the PDA.  Rural moved for summary judgment.

2

The district court granted Rural's motion after concluding that Durham had failed to establish a *prima facie* case of discrimination under the PDA.  To reach this conclusion, the district court mistakenly determined that Durham and the non-pregnant Rural EMTs who could not lift the required 100 pounds were not "similar in their ability or inability to work."  The court arrived at this determination because it erroneously factored into the "similar in their ability or inability to work" evaluation the distinct, post-*prima-facie*-case consideration of Rural's purported legitimate, non-discriminatory reasons for treating Durham and the non-pregnant employees differently.

We therefore vacate the grant of summary judgment.  Neither a non-pregnant EMT who is limited to lifting 10 or 20 pounds nor a pregnant EMT who is restricted to lifting 50 pounds or less can lift the required 100 pounds to serve as an EMT.  Since neither can meet the lifting requirement, they are the same in their "inability to work" as an EMT.  And that satisfies the plaintiff's *prima facie* requirement to establish that she was "similar [to other employees] in their ability or inability to work."

But because the district court determined that Durham did not make a *prima-facie*-case showing, it did not have occasion to separately evaluate Rural's purported legitimate, non-discriminatory reasons for denying Durham her requested accommodation.  Nor did it consider whether Durham had pointed to sufficient

evidence to raise a genuine issue of fact concerning whether Rural's stated reasons for treating Durham differently than other EMTs with lifting restrictions were pretextual. We therefore remand to the district court to make these assessments in the first instance.

## I.

Since we are reviewing an order granting summary judgment in this appeal, we set forth the evidence in the light most favorable to Durham, as the non-moving party, and draw all reasonable inferences in her favor. *Pesci v. Budz*, 935 F.3d 1159, 1165 (11th Cir. 2019).

Rural provided private ambulance and fire-protection services in 21 states, including Alabama. Durham began working for Rural in St. Clair County, as an emergency medical technician ("EMT"), in the first week of March 2015. She regularly worked more than 40 hours per week.

Durham's duties, among others, included assisting her medic partner with anything he needed in patient care. That required Durham to help lift the stretcher, which itself weighed more than 100 pounds, and lift the patient to and from the stretcher. In addition, Durham had to move equipment between trucks and restock her truck's supplies. These duties demanded Durham physically lift things "[p]retty much all day long."

At the end of August 2015, Durham learned she was pregnant.  At her next doctor's appointment, which occurred in September, Durham's doctor advised Durham not to lift more than 50 pounds during her pregnancy.  So following that appointment, Durham told Mike Crowell, then the general manager for Rural's St. Clair operations,[1] about her pregnancy and the lifting restriction.

In response, Crowell informed Durham that she would not be able to work on the truck.  Durham agreed.  So Durham asked to work either light duty or dispatch.

Rural had a light-duty-type policy, called the Transitional Work Program ("Light-duty Policy").  Under that Policy, Rural would "temporarily modify an employee's existing position and/or work schedule, or provide transitional assignments that [would] accommodate the temporary physical restrictions identified by the [employee's] treating physician."  By its terms, though, the Light-duty Policy applied to only those employees "who suffer from a work-related injury/illness."  Rural's corporate representative[2] testified in his deposition that he did not know the reason why only those with on-the-job injuries were eligible to take advantage of the Light-duty Policy.  Nevertheless, he characterized the Policy as recognizing a "difference between an elective condition . . . [and] an on-the-job injury."

---

[1] Crowell served as general manager for some of Rural's other nearby operations as well.
[2] *See* Fed. R. Civ. P. 30(b)(6).

The Light-duty Policy required Rural to accommodate workers while they were recovering from a work-related injury or illness and effectively created temporary positions that otherwise did not exist. For example, a person on light duty might be assigned to work tasks around the office that the office staff required.

Dispatcher, in contrast, was a dedicated position at Rural. It always existed, whether or not Rural had any workers suffering from an on-the-job injury or illness. Dispatchers sent ambulances out on calls. Durham attested that she checked the job board at work after her doctor informed her of the lifting restriction and saw "several dispatch positions open."[3]

Crowell spoke with Rural's Human Resources Office about Durham's requests. That office asked Crowell whether he had any light-duty-type positions or dispatch positions open. Crowell responded that he did not. In that case, the Human Resources Office said, only Rural's Unpaid Personal Leave policy was available to Durham.

---

[3] The district court appears to have viewed this statement of Durham's from a declaration Durham submitted after her deposition as contradictory to Durham's deposition testimony that she was not aware of any available light-duty positions when she spoke with Crowell. But Crowell's testimony, Durham's testimony, and Rural's Light-duty Policy make it clear that the dispatcher position was not "light duty" as contemplated by Rural's Light-duty Policy. Unlike light-duty positions, which were created to address the temporary needs of an employee injured or sickened on the job, dedicated dispatcher positions existed independently of the need for light-duty positions, and employees did not have to have been injured on the job to qualify for the dispatcher position. Of course, on summary judgment, we must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Williamson v. Brevard Cty.*, 928 F.3d 1296, 1304 (11th Cir. 2019). Since a reasonable way to understand Durham's two statements as not contradictory exists, we must construe Durham's statements that way.

Rural's Unpaid Personal Leave policy allowed Rural employees to take unpaid personal leave "for medical or extraordinary personal reasons." The Unpaid Personal Leave Policy explained that Rural would not grant unpaid personal leave "for the purpose of pursuing another position, temporarily trying out new work, or venturing into business." It also limited the leave period to 90 days, with the possibility of a single 90-day extension, warning that "[i]n no event can a personal leave extend beyond 6 months . . . under any circumstances." Finally, the Unpaid Personal Leave Policy cautioned that although Rural would "make every effort to restore the employee to the same or a comparable position at the end of an unpaid personal leave, . . . restoration [was] not guaranteed."

Crowell told Durham what he learned from the Human Resources Office. He advised her that she could not work light duty, as only those on workers' compensation could take advantage of Rural's Light-duty Policy. Crowell also stated that he had no dispatcher positions open. Rather, Crowell explained to Durham that she would have to take leave under Rural's Unpaid Personal Leave Policy.

On October 6, 2015, Rural mailed Durham a letter instructing that she could seek a personal leave of absence under the Unpaid Personal Leave Policy. But when Durham reviewed the Policy, she recognized that she might not receive an additional 90 days' leave following completion of the first period, meaning she would run out

of leave before her pregnancy was over and, according to the Unpaid Personal Leave Policy, forfeit her employment. She also understood the Policy to prohibit her from seeking another job or filing for unemployment. Because Durham could not be without income for the remainder of her pregnancy, she contacted Rural's Human Resources Office to request other options. That Office informed her that the Unpaid Personal Leave Policy was her only option, and it did not alleviate Durham's concerns that the Policy prohibited her from being able to obtain another job while on unpaid leave.

Durham sought to continue working as an EMT, despite the lifting restrictions, since she could not go without pay. But in light of what Durham had already told Rural about her doctor's restrictions, Rural required a medical release clearing Durham for full active duty as an EMT in order for Durham to be eligible to continue her work. Durham did not provide one. She also did not seek unpaid personal leave. After September 28, 2015, Rural did not again schedule Durham to work.

On November 16, 2015, Durham filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). She alleged that Rural had discriminated against her because of her pregnancy when it declined to provide her with a dispatcher position or light duty during her pregnancy. In support, Durham stated that "non-pregnant employees with lifting restrictions [had] been

accommodated with temporary transfers to dispatch and/or light/modified duty assignments." Discovery later revealed that Rural had offered accommodations under its Light-duty Policy to four employees with lifting restrictions imposed as a result of having been injured on the job. Two of these individuals were limited to lifting no more than ten pounds, one was constrained to sedentary work, and one had to wear a knee immobilizer.

In discovery, Rural also provided its Employee Handbook, which stated that, on a case-by-case basis, Rural accommodated employees who were "unable to perform some of their job functions due to a medical condition." By its terms, the policy did not limit its applicability to only those employees who were injured on the job. Indeed, Rural explained in its brief on appeal that this policy was available to all employees—whether injured on the job or not—who became unable to perform some or all of their job functions as the result of a medical condition. This policy was explicitly designed to comply with the Americans with Disabilities Act.

Durham stated in her EEOC charge that she viewed Rural's actions in denying her light-duty or dispatcher work "as effectively terminating [her] employment," since the only option[] presented to [her] . . . preclude[d] [her] ability to earn income."

After Durham filed her charge with the EEOC, Rural's Human Resources Office checked in with Crowell and asked, "Just so that I am clear. [sic] We do not

have any Dispatch positions or shifts open or her restrictions would not allow her to even do dispatch?"  Crowell responded that he did not "have any dispatch positions posted but if [he] needed to create a position for [Durham,] [he] could."  He clarified that "[o]pen spots are normally filled with part-time dispatchers or cross trained Bessemer [another office] employees," but he "could possibly create a position from 1400-2200 M[onday]-F[riday] call taking."  Rural made no such offer.

This lawsuit followed.  In her complaint, Durham alleged a single count that Rural, in deciding not to allow Durham to continue working, had discriminated against her, in violation of the Pregnancy Discrimination Act of 1978.

Following discovery, Rural moved for summary judgment, and Durham opposed the motion.  The district court granted Rural's motion and entered summary judgment for Rural.  It did so after concluding that Durham had failed to establish a *prima facie* case of pregnancy discrimination because she had not shown that Rural treated Durham less favorably than others who were not pregnant but were similar to Durham in their ability or inability to work.  It thus granted Rural's motion and entered summary judgment for Rural.  Durham now appeals.[4]

---

[4] The EEOC and a number of other organizations have filed *amicus curiae* briefs in support of Durham.

## II.

We review *de novo* the district court's grant of summary judgment.  *Pesci*, 935 F.3d at 1165.  Summary judgment should be granted only if the moving party demonstrates that no genuine dispute exists over the material facts, and the moving party is entitled as a matter of law to judgment.  Fed. R. Civ. P. 56(a).

## III.

Among other things, Title VII, 42 U.S.C. § 2000e *et seq*., prohibits employers from "discharg[ing]" or "otherwise . . . discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).

In 1976, the Supreme Court construed this language to uphold as nondiscriminatory a company plan that provided "nonoccupational sickness and accident benefits to all employees" but did not authorize "disability-benefit payments for any absence due to pregnancy."  *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 128, 129 (1976).  To reach this conclusion, the Court reasoned that the plan did not discriminate on the basis of sex since "there was no risk from which men are protected and women are not."  *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 227 (2015) (quoting *Gilbert*, 429 U.S. at 138) (internal quotation marks omitted).  In the *Gilbert* Court's view, the company did "not distinguish between pregnant women

and others of similar ability or inability *because of pregnancy*."  *Id.* at 242 (Scalia, J., dissenting).

Congress responded to *Gilbert* with the PDA.  *Young*, 575 U.S. at 222–23 (citing S. Rep. No. 95-331, p. 8 (1978)).  In relevant part, the Act clarifies that the phrase "because of sex" includes "because of . . . pregnancy . . . ;  and women affected by pregnancy . . . shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work . . . ."  42 U.S.C. § 2000e(k).  The Supreme Court has observed that "Congress' unambiguous intent in passing the Act was to overturn both the holding and the reasoning of the Court in the *Gilbert* decision."  *Young*, 575 U.S. at 227 (cleaned up).

In *Young*, the Supreme Court announced a new, modified *McDonnell Douglas*[5] burden-shifting framework to be used in PDA cases involving indirect evidence of disparate treatment.  *Young,* 575 U.S. at 228.  Under that framework, a plaintiff may make out a prima facie case of discrimination by "showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under" the Act.  *Id.* (cleaned up).  The *prima-facie*-case burden the plaintiff bears is not an "onerous" one.  *Id.*  Rather, to establish a *prima facie* case

---

[5] *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).

12

of discrimination under the Act, a plaintiff must show only that (1) she is a member of the protected class; (2) she requested accommodation; (3) the employer refused her request; and (4) the employer nonetheless accommodated others "similar in their ability or inability to work." *Id*. at 229.

After a plaintiff satisfies her *prima facie* burden, the employer may come forward with "legitimate, nondiscriminatory reasons" for denying the plaintiff's requested accommodation. *Id.* (cleaned up).  Normally, though, an employer cannot simply say "that it is more expensive or less convenient to add pregnant women to the category of those ('similar in their ability or inability to work') whom the employer accommodates," since that reason alone would generally be "[in]consistent with the Act's basic objective." *Id.*

If the employer presents an ostensible "legitimate, nondiscriminatory" reason for what it has done, the plaintiff then has the opportunity to attempt to demonstrate that the employer's stated reason is "in fact pretextual." *Id.* (internal quotation marks omitted).  The Supreme Court has explained that a plaintiff does enough to survive summary judgment if she shows both that "the employer's policies impose a significant burden on pregnant workers" and that "the employer's 'legitimate, nondiscriminatory' reasons are not sufficiently strong to justify the burden, but rather—when considered along with the burden imposed—give rise to an inference of intentional discrimination." *Id.*

With this framework in mind, we consider the evidence at issue here.  We begin, of course, with Durham's burden to set forth a *prima facie* case.

First, the parties do not dispute that Durham satisfies the first two prongs of the *Young prima facie* test.  As a pregnant woman, she was obviously part of the class protected by the *Pregnancy* Discrimination Act.  *See also* 42 U.S.C. § 2000e(k) ("The term[] 'because of sex' . . . include[s] . . . because of or on the basis of pregnancy . . . .").  And she sought an accommodation from Rural in the form of light-duty or dispatcher work.

As for the third prong—whether Rural refused Durham's request for accommodation—we conclude Durham established that as well.  Rural declined to offer Durham light-duty or dispatcher work.  Indeed, Rural does not meaningfully contest Durham's satisfaction of this consideration.

That brings us to the fourth prong—whether Rural accommodated others who were not pregnant but were "similar in their ability or inability to work."  Because the Court's discussion in *Young* is instructive, we take the time to review that case in further detail.

Young worked for UPS as a driver, picking up and delivering packages—a job that required her to be able to lift up to 70 pounds by herself.  575 U.S. at 215.  When she became pregnant, her doctor recommended that she not lift more than 20 pounds during the first half of her pregnancy and 10 during the second.  *Id.* at 214.

14

So Young sought a temporary work assignment during her pregnancy, but UPS rejected her request. *Id.* at 215. Instead, it informed her that she could not return to work while pregnant because she did not satisfy UPS's lifting requirements and she did not qualify for a temporary alternative work assignment. *Id.* UPS therefore required Young to take an unpaid leave of absence. *Id.* at 216.

Despite its refusal to accommodate Young, UPS gave other categories of employees who could not perform their normal work assignments temporary alternative work. *Id.* For example, among others, it accommodated employees injured on the job; employees disabled on the job (including those with resulting lifting limitations); those who had lost their Department of Transportation certifications because of a failed medical exam, a lost driver's license (including an employee who had lost his license for driving under the influence), or involvement in a motor-vehicle accident; and some employees who had been disabled off the job. *Id.* at 216–17. The Supreme Court held that, viewed in the light most favorable to Young, a genuine dispute existed as to whether UPS gave more favorable treatment to at least some employees "whose situation cannot reasonably be distinguished from Young's." *Id.* at 231.

We have explained that *Young*'s analysis of the *prima facie* case's fourth prong means that, in contrast to Title VII's more general comparator analysis, "the comparator analysis under the PDA focuses on a single criterion—one's ability to

do the job." *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1228 n.14 (11th Cir. 2019) (en banc).  Here, as in *Young*, Durham's temporary inability to lift more than 50 pounds and her colleagues' inabilities to lift more than 10 or 20 pounds rendered Durham, and her colleagues injured on the job, equally unable to perform the 100-pound lifting duties of an EMT.  Thus, Durham and her colleagues who were injured on the job were "similar in their ability or inability to work."  Also, Rural's Employee Handbook also left open the possibility that Rural similarly accommodated some of those disabled off the job, including those with resulting lifting restrictions.  For these reasons, Durham has satisfied the fourth prong of her *prima facie* case.[6]  *See Legg v. Ulster Cty.*, 820 F.3d 67, 74 (2d Cir. 2016) ("Legg has . . . established a *prima facie* case of discrimination under *Young*.  She sought a light duty accommodation while pregnant.  The County did not accommodate her.  And, as a matter of policy, the County provided light duty accommodations to other employees who were similar in their ability or inability to work, namely those who were unable to perform non-light-duty tasks as a result of injuries incurred on-duty.").

Because Durham has established a *prima facie* case, we must turn to Rural's ostensible "legitimate, non-discriminatory" reasons for refusing to offer Durham

---

[6] To the extent *Spivey v. Beverly Enterprises, Inc.*, 196 F.3d 1309 (11th Cir. 1999), holds otherwise, it has been abrogated by *Young*.

light duty or a dispatcher position.  Here, Rural offered two:  Rural's Light-duty Policy applies to only those injured on the job, and Rural had no dispatcher positions available at the time Durham sought accommodation.

Therefore, to survive summary judgment, Durham must point to enough evidence to create a material issue of fact that Rural's stated reasons for denying accommodation are pretextual.  *Young*, 575 U.S. at 229.  One way she can do this is by demonstrating that Rural's policies that provide the basis for its rejection of Durham's request for accommodation "impose a significant burden on pregnant workers," and that Rural's reasons for its policies failing to accommodate pregnant employees such as Durham "are not sufficiently strong to justify the burden, but rather . . . give rise to an inference of intentional discrimination." *See id.*  The district court never reached this part of the analysis because it stopped after determining that Durham had failed to establish a *prima facie* case.  As we have just explained, that was error.

Because the district court never considered whether Durham presented enough evidence to create a genuine dispute of fact over whether Rural's reasons for refusing to provide her with a light-duty or dispatcher position were pretextual, the parties likewise did not focus their arguments on appeal on this issue.  We therefore remand this case to the district court for a determination in the first instance on the issue of pretext, after the court conducts a full review of the existing record and any

17

additional evidence the district court may choose to allow the parties to present on this issue.  *See*, *e.g.*, *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1228 (11th Cir. 2008).

## III.

For the reasons we have stated, summary judgment is vacated, and the case is remanded to the district court for further proceedings consistent with this opinion.

**VACATED and REMANDED.**

BOGGS, Circuit Judge, concurring:

I fully agree with the court's holding that the district court erred in its analysis of the requirements of a *prima facie* case under the Pregnancy Discrimination Act.  I also agree that the case must be remanded for further proceedings at the post-*prima-facie* stage to allow the employer to present its "legitimate, nondiscriminatory reason[s]" and for the plaintiff in turn to argue that these are pretextual.  *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 208 (2015) (internal quotation marks omitted).  Thus, I concur in the court's opinion and judgment.

I write separately, however, because I fear that the lead opinion's explanation of the seminal Supreme Court case of *Young* does not fully capture the complexities of that opinion and the gaps that it leaves in our understanding of how trial courts should proceed in PDA cases once a *prima facie* case is made.

When applying the PDA to employers who grant light-duty work to workers injured on the job but not to those injured off the job, courts confront a dilemma: both are similar to a pregnant employee in their "inability to work."  42 U.S.C. § 2000e.  When there is direct evidence of discrimination, of course, this is not a difficulty—but when a plaintiff relies on indirect evidence, the issue can be nettlesome.  Prior to 2015, this court used a standard Title VII burden-shifting

framework to evaluate such claims and, as the fourth element of the prima facie inquiry, required the plaintiff had to show that "she suffered from a differential application of work or disciplinary rules." *Spivey*, 196 F.3d at 1312. Like most other circuits, we held that "[t]he correct comparison is between [the plaintiff] and other employees who suffer non-occupational disabilities, not between Appellant and employees who are injured on the job." *Id.* at 1313. In cases such as this one, such a rule was fatal to the plaintiff's case.

As today's opinion notes, p. 13, *Young* marked a significant shift in PDA law. *Young* was a distinctive case, due to the large number of categories of workers whom UPS accommodated. *Cf. Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1228 n.14 (11th Cir. 2019) (en banc).[1] Therefore, it is not altogether clear the accommodation of which categories of employees triggered the Court's conclusion that "a genuine dispute existed as to whether UPS gave more favorable treatment to at least some

---

[1] As we noted in *Lewis*:

> The plaintiff in *Young*, who had sought a waiver of a lifting requirement during her pregnancy, met her *prima facie* burden by pointing to seven separate classes of non-pregnant employees whom her employer had accommodated—three of those classes enjoyed group-wide accommodations pursuant to a collective bargaining agreement, and four other classes of "[s]everal employees" had been accommodated on an *ad hoc*, but seemingly regular, basis. *See id.* at 1346–47. The sheer numbers were overwhelming. The plaintiff's allegations in *Young* showed that the employer had "accommodate[d] most nonpregnant employees with lifting limitations while categorically failing to accommodate pregnant employees with lifting limitations." *Id.* at 1354. As the Court put the matter, rhetorically, "why, when the employer accommodated so many, could it not accommodate pregnant women as well?" *Id.* at 1355.

918 F.3d at 1228 n.14.

employees 'whose situation cannot reasonably be distinguished from Young's.'"
*Supra*, op. 16, quoting *Young*, 575 U.S. at 231.  This is particularly troublesome
because some of the comparators enumerated in *Young* intuitively support an
inference of deliberate discrimination, while others do not. On the one hand, UPS
was willing to accommodate some employees injured off the job or even who had
lost their licenses for driving while intoxicated, but not pregnant workers.  On the
other hand, there were employees who were accommodated because some other law
either mandated or heavily incentivized their accommodation: namely, those
injured-on-the job (who otherwise "would have been eligible for workers'
compensation benefits") and those whose accommodation was "required by the
ADA."   *Young*, 575 U.S. at 239 (Alito, J., concurring).  As previously noted, pre-
*Young*, we took account of the fact this second category of accommodations could
not be construed as evidence of intentional discrimination by requiring that the
plaintiff show that coworkers injured *off* the job had been treated better than she was.
*See Spivey*, 196 F.3d at 1312.

Nevertheless, there are three good reasons to conclude, as the court does
today, that *Young* changed the *prima facie* test and that the comparator requirement
is now satisfied by the plaintiff's pointing toward coworkers who were
accommodated after being injured on the job.  First, the Supreme Court decision
abrogated a Fourth Circuit ruling that had required the plaintiff to show that all

coworkers injured off the job had been treated differently than she was. *See Young v. United Parcel Serv., Inc.*, 707 F.3d 437, 447–48 (4th Cir. 2013), *vacated and remanded*, 575 U.S. 206 (2015). Second, the new framework in *Young* makes explicit many of the policy considerations that had underlain the choice-of-comparator discussion in previous appellate court decisions, but moves them to the legitimate-reason and pretext inquiries. *Compare Spivey*, 196 F.3d at 1312–13 *with Young*, 575 U.S at 229–30. At these later stages of the *Young* analysis, we are now told to consider the company's reasons for treating pregnant workers differently than those injured on the job. We are *not* to do so at the *prima facie* stage.

Finally, the *en banc* decision in *Lewis* is instructive. There, the court indicated that the *prima facie* inquiry in PDA cases is to be treated differently than in other Title VII cases. *See Lewis,* 918 F.3d at 1228 n.14. In the mine run of Title VII cases, the comparator analysis is an important way of inferring discrimination (if like cases are treated differently). *See Lewis* at 1222–23 ("Treating different cases differently is not discriminatory, let alone intentionally so."). In the PDA context, by comparison, *either* available comparator—coworkers injured on the job or coworkers injured off the job—is going to be at once "like" (because unable to work) or "unlike" (because their inability to work came through injuries or ailments that are not pregnancy). The question is rather whether the company's policy choices

reflect an intent to discriminate.  And that is better evaluated in the *post-prima facie* stages.

For that exact reason, however, an employer can still make the argument that it has not discriminated by treating a pregnant employee the same as one injured off the job.  Such an argument has been moved as to its proper placement, not done away with.  *Young* eschews a "most-favored-nation" reading of the PDA, under which if any benefit were offered to some sub-class of workers, it must be offered to pregnant workers.  *See Young*, 575 U.S. at 222; *see also id.* at 239–40 (Alito, J., concurring).  "[T[he fundamental question in *Young*, as here, was whether the employer's actions gave rise to valid inference of unlawful discrimination." *Lewis*, 918 F.3d at 1228 n.14 (citing *Young*, 135 S.Ct. at 1354).  It remains an open question, both as a matter of law and as to whether this is in fact what happened here.  Such questions are left to the district court to decide in the legitimate-reasons and pretextual inquiries of the *Young* test, not at the *prima facie* stage.

With the nuances expressed above, I concur.

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

April 17, 2020

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  18-14687-AA
Case Style:  Kimberlie Durham v. Rural/Metro Corporation
District Court Docket No:  4:16-cv-01604-ACA

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing, are available at www.ca11.uscourts.gov.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against appellee.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call T. L. Searcy, AA at (404) 335-6180.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6151

OPIN-1A Issuance of Opinion With Costs