

FILED
2021 Mar-12  PM 09:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | | |
|---|---|---|
| KIMBERLIE MICHELLE DURHAM, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:16-cv-01604 |
| | ) | |
| RURAL/METRO CORPORATION, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSES TO DEFENDANT'S OBJECTIONS
TO PLAINTIFF'S DEPOSITION DESIGNATIONS**

COMES NOW Plaintiff Kimberlie Michelle Durham and ,per the discussion at today's final pretrial conference, files these responses to the Defendant's objections to the Plaintiff's deposition designations (Doc. 93) to permit the court to rule on the objections prior to trial:

1.  **Deposition Designations for Minda Reaves**

    a.  23:24-24:12

        i.  Defendant objected to this testimony on "relevance, prejudice including discussion of dismissed claim(24:2-4)." (Doc. 93, p. 5).

        ii. The testimony at issue concerns the witness's involvement in the decisions not to accommodate the Plaintiff:

            24  Q Did you make the decision to terminate
            25  Kimberlie Durham
            1  A No.

```
 2  Q Did you make the decision not to allow her to
 3  have light duty?
 4  A No, I don't believe I did.
 5  Q Did you make the decision to deny her a
 6  transfer to a dispatch position?
 7  A No.
 8  Q Do you know who made any of those decisions,
 9  be it to terminate Ms. Durham, to deny her light duty,
10  or to deny her a transfer to dispatch?
11  A I don't. I don't even know any of those to
12  be truths, so, no, I don't.
```

(Doc. 86-1, p. 8)

    iii.   The testimony is relevant to establishing who made the decisions challenged in this action. Defendant asserts generally there is prejudice, but does not how explain there is any prejudice from Corbeil denying making certain decisions and stating she does not know who did.

  b.  25:05-28:11

    i.   Defendant objected on "relevance, prejudice including discussion of dismissed claim (28:1-11)." (Doc. 93, p. 5).

    ii.   The testimony at issue involves:

(a) Ms. Reaves's memory of the events relating to the Plaintiff which is relevant to the weight and credibility the jury will give to her testimony,

(b) her knowledge of the Defendant's response to the Plaintiff's notice of claim and preservation of evidence letter which is relevant to the Defendant's fifteenth defense that it had a policy

prohibiting discrimination and a procedure for the resolution of complaints alleging discrimination (Doc. 9, p. 13), Defendant's sixteenth defense that it exercised reasonable care to prevent and correct discrimination and that Plaintiff failed to take advantage of preventive or corrective opportunities (Doc. 9, p. 13), and issue of what the Defendant did to preserve evidence relating to Plaintiff's claim

(c) her memory of her November email exchange about Ms. Durham's legal claims among her regional director Kenneth Simpson, Mike Crowell, and her (Defendant's trial exhibit 6 (Doc.87, p. 2)/Plaintiff's trial exhibit 11 (Doc. 85, p. 2); and

(d) her recollection that it was not the practice of the Defendant to only give light duty to persons injured on the job all of which is relevant to the efforts the Defendant made in response to the Plaintiff's request to be moved to a position that allowed her to work within her lifting restriction.

The testimony reads:

```
 4  Q Is your understanding of Ms. Durham's
 5  situation something that comes from your personal
 6  memory or something that was communicated to you from
 7  legal counsel?
 8  A I don't have any personal memory of it. The
 9  only thing that sparked any memory of it, albeit
10  little, was the e-mail where I asking if she was filing
11  for unemployment, and I don't even really have a memory
```

3

12  of that. I just know that, yes, that is an e-mail that
13  I would have sent.
14  (Plaintiff's Exhibit No. 3 was marked for
15  identification.)
16  BY MS. LEONARD:
17  Q Okay. I'm going to show you a few documents
18  in the case. Exhibit 3 is a letter which my office
19  sent to Rural/Metro in November of 2015.
20  Have you ever seen this before?
21  A Not that I recall.
22  Q Are you aware of any action that Rural/Metro
23  took in response to this November 3rd letter from my
24  office?
25  A No.
1  Q One thing this letter did was ask Rural/Metro
2  to preserve any paperwork that might relate to
3  Ms. Durham's claims.
4  Do you have any knowledge whether Rural/Metro
5  ever did that?
6  A No, because I don't recall ever seeing this
7  letter.
8  Q Okay. In terms of the address for the
9  director of human resources, 8465 North Pima Road in
10  Scottsdale, Arizona, was that Rural/Metro's address?
11  A That was the corporate address. That's not
12  where I was nor, to my knowledge, was there a director
13  there.
14  Q All right. Where were you located?
15  A Here in Roswell.
16  Q Do you have any knowledge as to whether
17  Rural/Metro took any action to respond to my office's
18  November 3rd letter?
19  A I do not.
20  (Plaintiff's Exhibit No. 4 was marked for
21  identification.)
22  BY MS. LEONARD:
23  Q Exhibit 4 to your deposition appears to be an
24  e-mail exchange that was sent in November of 2015. If
25  you could take a minute to look at that and tell me if
1  you are familiar with that exchange.
2  A I am familiar to the extent that I'm reading
3  it.
4  Q All right. Do you have any memory of this
5  e-mail exchange?
6  A No, other than me reading it.
7  Q Okay. Looking at Exhibit 4, on the second
8  page, there's an e-mail that appears to be from you to
9  Mike Crowell and Kenneth Simpson on November 10, 2015.
10  Who is Kenneth Simpson?
11  A He was the regional director that covered
12  Alabama.
13  Q Did he have any type of authority over you?
14  A No.
15  Q Looking at this, it appears you wrote: Can
16  you catch me up on this one? She is filing a
17  discrimination charge due to pregnancy, and I need to

4

```
18  get the history and background.
19  Do you know what prompted you to write that?
20  A No, I don't. I would assume it was -- I
21  don't know.
22  Q Okay. In response, it appears Mr. Crowell
23  sent you an e-mail. Do you recall if you did anything
24  when you received this e-mail from Mr. Crowell?
25  A I do not recall.
1   Q In the e-mail, one of the things that
2   Mr. Crowell writes that he said to Ms. Durham -- in the
3   last paragraph, he wrote to you: Kimberlie called me a
4   week or two later and asked if she could do light duty
5   to get some hours. I informed her that light duty was
6   only assigned to employees that were injured on duty on
7   workman's comp.
8   Was that the practice at Rural/Metro, that
9   light duty was only given to employees injured through
10  [sic] workman's comp?
11  A No, not to my knowledge
```

(Doc. 86-1, pp. 8-9)

    iii.   Defendant offers no argument or explanation as to how any of this testimony is prejudicial, so it is impossible for the Plaintiff to formulate a response to the Rule 403 objection.

c.  29:03-29:20

    i.   Defendant objected on "relevance, prejudice including discussion of dismissed claim (29:3-8)." (Doc. 93, p. 5).

    ii. The testimony at issue reads:

```
3   Q Do you know why you did not take any
4   corrective action to correct Mr. Crowell's
5   representation to Ms. Durham that light duty was only
6   available to people on workman's comp?
7   A No. That would have been my clarifying
8   question back to him.
9   Q You e-mailed him: Just so that I'm clear, we
10  do not have any dispatch positions or shifts open for
11  her restrictions to allow her to even do dispatch?
12  What prompted you to write that?
13  A I was -- what prompted me to write that? I
14  guess his response. I was asking to be sure to confirm
15  my understanding that we did not have anything
```

16  available for her to do in that operation that would
17  meet her restrictions.
18  Q Do you know if Ms. Durham had ever requested
19  a transfer to dispatch?
20  A I don't.

(Doc. 86-1, p. 9)

    iii.    Ms. Reaves was asked why she was asking Mr. Crowell if there were any open dispatch positions. This testimony concerns the Defendant's actions in response to learning of Plaintiff's claim of discrimination and request for accommodation. The testimony goes to questions the jury will be required to resolve, so it is relevant. Defendant offers no argument or explanation as to how any of this testimony is prejudicial, so it is impossible for the Plaintiff to formulate a response to the Rule 403 objection.

    d.  31:19-31:25[1]

    i.    Defendant's pretrial position is that "no positions were available that met [Plaintiff's] restrictions." (Doc. 84, p. 4). Plaintiff contends she saw open dispatch positions. The testimony is relevant because it concerns the Defendant's records that could resolve this disputed fact:

---

[1]    Defendant's designation is 31:19 to 41:25. Plaintiff did not have a designation that included that entire section, so Plaintiff is assuming this is a typographical error because she did designate 31:19-31:25 and Defendant's next objection starts at page 40, line 8 of the deposition.

```
19   Q How did Rural/Metro keep information that
20   would allow me to see whether there were any dispatch
21   openings in November of 2015?
22   A We had an applicant tracking system. I don't
23   know whether any of that data is still available, but
24   we would have had something posted through our
25   applicant tracking system.
```

    e.  40:08-45:21

        i.     Defendant objected on relevance and prejudice grounds.

        ii.    The testimony concerns:

            a.  Defendant's policy or practice for accommodating lifting restrictions for nonpregnant employees which is relevant to the issue of whether the Defendant's refusal to accommodate Plaintiff by placing her in a dispatch position constituted pregnancy discrimination;

            b.  Defendant's handbook (an exhibit on both parties' exhibit lists)  and what it provides in terms of providing accommodation to persons with disabilities[2] which is relevant to the issue of whether the Defendant denied the Plaintiff an accommodation due to her pregnancy;

            c.  Who Ms. Durham should have contacted if she needed an accommodation which is relevant to the issue of whether the

---

[2]     The witness testified that pregnant employees are considered persons with disabilities under the policy.

Defendant denied the Plaintiff an accommodation due to her pregnancy;

d. Who would or should have been involved in any accommodation decision which is relevant to the issue of whether the Defendant denied the Plaintiff an accommodation due to her pregnancy;

e. Whether non-pregnant employees with lifting restrictions received accommodations to put them in positions to let them continue working which is relevant to the issue of whether the Defendant denied the Plaintiff an accommodation due to her pregnancy;

f. Rural/Metro's practice of requesting medical documentation from pregnant employees about restrictions which is relevant to Defendant's assertion it asked Ms. Durham for medical documentation and she did not provide it;

iii. The testimony at issue reads:

```
 8  Q What was Rural/Metro's policy or practice as
 9   it related to accommodating lifting restrictions for
10   nonpregnant employees?
11   A It would have been the same for pregnant
12   employees.
13   Q That would have been what?
14   A If we had something available that would meet
15   the restrictions, then we would offer that to them.
16   (Plaintiff's Exhibit No. 8 was marked for
17   identification.)
```

18   BY MS. LEONARD:
19   Q I'm going to show you what has been marked
20   Exhibit 8, which is Rural/Metro's employee handbook.
21   Do you know if this was the handbook that was
22   in place during Ms. Durham's employment with
23   Rural/Metro?
24   A I don't. I don't know if this is the -- I
25   don't see where it says what version this is. It could
1   have been, but we would make updates to it on occasion.
2   I don't know if this is the one that was updated or
3   not.
4   Q Are you familiar with this handbook?
5   A Yes.
6   Q All right. Was part of your job to ensure
7   that the policies and practices set forth in this
8   handbook were followed by the employees at Rural/Metro?
9   A Yes.
10   Q I want to look at page 8 of the handbook.
11   A Okay.
12   Q At the bottom of the page there's a section
13   that says: Accommodations for qualified individuals
14   with disabilities.
15   Are you familiar with this section of the
16   handbook?
17   A What did you say it was? Accommodations for
18   qualified individuals?
19   Q Correct.
20   A Yes.
21   Q Was pregnancy considered a disability under
22   this provision?
23   A Yes.
24   Q The first sentence reads: Rural/Metro
25   recognizes that employees may be unable to perform some
1   of their job functions due to a medical condition.
2   Would that include pregnancy?
3   A Yes.
4   Q Next, it says: Employees who desire an
5   accommodation due to a medical condition should consult
6   with the local division or corporate human resources
7   representative.
8   For Ms. Durham, who worked in Powell City,
9   Alabama, who would that have been?
10   A It would have been Jennifer Harmon.
11   Q Do you know if Ms. Durham made any such
12   request to Jennifer Harmon?
13   A I do not know.
14   Q Next, it reads: Such requests will be
15   considered on a case-by-case basis and will be
16   consistent with ADA and applicable state and federal
17   law with final approval of the division corporate human
18   resources level.
19   Do you know if any type of consideration was
20   given to providing accommodation to Ms. Durham?
21   A I would assume there was.
22   Q Would have made that consideration?
23   A It would have been a combination of HR and

24  the whoever the ops manager was, which appears to be
25  Mike Crowell.
1  Q Who in HR would that have been?
2  A Jennifer Harmon.
3  Q If such consideration for accommodation had
4  been made, would there be any documentation that would
5  reflect that?
6  A I don't know. There should be.
7  Q If there is no such documentation, can we
8  infer that no consideration for accommodation was made?
9  A No.
10  Q Why is that?
11  A Because we have documents here that show we
12  did consider it. There's an e-mail.
13  Q The E-mail you're referring to is Exhibit 4?
14  A Uh-huh.
15  Q Is that a yes?
16  A Yes.
17  Q Do you know of anybody who worked in Powell
18  City or Gadsden as a paramedic or EMT had been allowed
19  light duty?
20  A I'm not aware. Powell City, Alabama? I'm
21  not aware. I doubt it, but I'm not aware.
22  Q If Mike Crowell testified to individuals who
23  had been allowed light duty due to workers'
24  compensation lifting restrictions, would you have any
25  reason to disagree with him?
1  A Repeat the question.
2  Q Sure. If Mike Crowell testified that Daniel
3  Tressel, Jimmy McKibben, Christopher Dubeck [phonetic],
4  Sapphire Duwalt, and maybe more were allowed light-duty
5  assignments due to to lifting restrictions as a result
6  of an on-the-job injury, would you disagree with him?
7  A I don't know that to be true or untrue.
8  Q You wouldn't dispute his testimony, would
9  you?
10  A I don't have any knowledge to be able to
11  dispute it or confirm it.
12  Q If Mr. Crowell testified that, if somebody
13  had a lifting restriction as result of an on-the-job
14  injury, a job would be created or work would be found
15  for them to do, would you disagree with his testimony?
16  A It wouldn't be anything that came from our
17  office. I can tell you that. If they did that, it
18  would've been local.
19  Q Do you recall having any conversations with
20  Mr. Crowell, either in person or on the phone, about
21  Ms. Durham?
22  A No.
23  Q Do you know if it was Rural/Metro's policy or
24  practice to request documentation from a pregnant
25  employee with a lifting restriction to verify the
1  lifting restriction?
2  A Yes, we would have.
3  Q What would be the reason for that?
4  A So we would understand what the restrictions

5  are to see if it was something that we could
6  accommodate.
7  Q If no documentation of the lifting
8  restrictions were provided, would Rural/Metro allow the
9  employee to continue to work?
10  A Not if they said they had just been given
11  restrictions. It wouldn't be safe.
12  Q Did you make any request of Ms. Durham to
13  provide you with documentation relating to her medical
14  condition?
15  A I don't recall ever speaking to her, so I
16  can't answer that.
17  Q Did you ask anyone to make a request of her
18  for documentation?
19  A I think I said before, I don't recall this,
20  other than the e-mails I've seen that clearly I wrote,
21  so, no, I don't.

2.       **Deposition Designations for 30(b)(6) Eric Morris**

a.  24:2-24:17

    i.  Defendant raised a foundation objection to the witness's

    testimony about one of the qualifications necessary for the

    witness to hold his job.

    ii.  The testimony reads:

```
0 2 In the Qualifications section for this
0 3 document, Plaintiff's Exhibit 2 which is your job
0 4 description, one of the qualifications is
0 5 "applicable knowledge of applicable state and
0 6 federal employment laws, labor laws, governmental
0 7 compliance requirements, and immigration laws".
0 8 What are the applicable state and federal employment
0 9 laws referenced in this bullet?
1 0 MS. NORDSTROM: Same objection.
1 1 THE WITNESS: I mean that's an exhaustive
1 2 list. Your common ones would be related to,
1 3 you know, FMLA or things as you mentioned
1 4 earlier, the Title 7. Anything that creates a
1 5 protected class of employees. But there's a
1 6 very expansive list, there's no way I could
1 7 give you a complete -- specific --
```

    iii.  It is not clear what foundation the Defendant contends is

    lacking. The witness is being asked about his duties as a senior

    HR Manager for the Defendant. He worked within the job and

executed the duties, so he is in a position to speak to what those duties involved.

b. 31:21-32:2

 i. Defendant did not object to Plaintiff's designation of page 30, line 7 to page 31, line 9 in which the witness testified about what efforts, if any, the Defendant made to review its policies and practices to ensure that it they would comply with the Pregnancy Discrimination Act following *Young v. UPS*. However, Defendant objects to page 31, line 21 to page 32, line 2 as involving a legal conclusion.

 ii. The testimony to which the Defendant objects reads:

```
0 3 1 : 2 1 Q. What was your understanding of what Young
2 2 v. UPS meant for application of the Pregnancy
2 3 Discrimination Act?
2 4 MS. NORDSTROM: I'm going to object to the
2 5 extent it requires legal conclusion. But if
0 3 2 : 0 1 you know you can answer.
0 2 THE WITNESS: I can't clearly recall.
```

 iii. The testimony does not form a legal conclusion; the witness testified he could not recall what *Young v. UPS* meant.[3]

c. 32:24-33:18

---

[3]  Defendant did not raise a relevance objection, but the testimony is relevant to showing the Defendant's reckless disregard for its employees rights secured by the PDA when the person whose job description requires him to have "knowledge of applicable state and federal employment laws, labor laws, governmental compliance requirements, and immigration laws" cannot speak to this issue. Defendant's fifteenth defense asserts that it exercised reasonable care to prevent and correct alleged discrimination. (Doc. 9, p. 13).

i.  Defendant objected to this testimony as calling for a legal

conclusion and constituting hearsay. The testimony at issue is:

```
2 4 Q. And I do have a copy of the case if you
2 5 want to look at it. I didn't think you would want
0 1 to read it but I'm happy to provide it to you if you
0 2 need it. But would you disagree that you would have
0 3 learned through these sources that Young v. UPS said
0 4 that a pregnant employee shouldn't be treated
0 5 differently than any other employee that might have
0 6 a short-term or long-term disability in terms of
0 7 providing an accommodation?
0 8 MS. NORDSTROM: I'm going to object to the
0 9 extent it requires him to make a legal
1 0 conclusion. But you can answer if you know.
1 1 THE WITNESS: I would not disagree with
1 2 that assertion.
1 3 BY MS. LEONARD:
1 4 Q. Okay. Did Rural/Metro ever send you to
1 5 any seminars or legal education, SHRM meetings --
1 6 did it send you for any type of outside training as
1 7 it related to the Pregnancy Discrimination Act?
1 8 A. No.
```

ii.  The testimony involves the witness, whose job involves

knowing federal employment laws, being asked about what he

learned through his efforts to stay on top of the law about

*Young v. UPS* and the fact that the Defendant did not send him

to any outside training relating to the PDA.

1.  The testimony about the outside training is neither a legal

conclusion or hearsay. It does not involve an out of court

unsworn statement being offered for the truth of the

matter asserted, nor is it drawing a conclusion about the

law.

2.  The testimony about the witness's understanding on

*Young v. UPS* based on what he has learned through

13

sources (identified in the testimony to which the

Defendant did not objection, page 30 line 7 to page 31,

line 9) is him testifying to what he learned. It is not an

unsworn statement offered for the truth of the legal

standard. It is the witness being asked if he agrees with

an interpretation of *Young.* The Defendant cannot on the

one hand argue its HR employees are knowledgeable and

stay abreast of the law to make sure employee rights are

protected while denying the Plaintiff an opportunity to

show the inadequacies in the Defendant's efforts.

Further, if the Defendant acted contrary to its corporate

representative's understanding of what the law required,

such a fact is relevant to establishing punitive damages.

d.  35:15-36:12

    i.  Plaintiff will agree to withdraw this designation.[4]

e.  48:11-50:2

    i.  Defendant objected to this designation a including hearsay,

       irrelevant information, and being prejudicial. However, the

       Defendant included a portion of this designation in its own

---

[4]    The Plaintiff does not agree with the Defendant that the testimony at issue is hearsay but in the effort to streamline the presentation of the evidence is withdrawing this designation.

deposition designations, page 49 lines 2 to 15 (Doc. 87, p. 1, ¶ 2(c)).

ii.   Plaintiff is willing to limit this designation to pages 49, line 2 through page 50, line 2 which reads:

```
0 2 Q. What is the practice for accommodating
0 3 someone with an on-the-job injury?
0 4 A. With someone with an on-the-job injury,
0 5 you know, we offer them -- most employers refer to
0 6 it as something called "light duty". More
0 7 specifically it's transitional work assignment. So
0 8 if there is something that doesn't affect or
0 9 conflict with their doctor's recommendations or
1 0 restrictions, then we will try to have them fill any
1 1 opportunities that we have available. That may mean
1 2 clerical work, it could mean stocking bins to go on
1 3 an ambulance, or anything of that nature. Something
1 4 that specifically would, again, not conflict with
1 5 their restrictions.
1 6 Q. Did you look into whether light duty had
1 7 been offered to anybody working in Alabama as a
1 8 result of an on-the-job injury?
1 9 A. Specifically, no.
2 0 Q. Did you look into whether anyone in
2 1 Alabama had been offered light duty?
2 2 A. Specifically, no.
2 3 Q. Did you look into whether a light duty
2 4 accommodation would have been possible had
2 5 Miss Durham suffered an on-the-job injury in October
0 1 of 2015?
0 2 A. I did not look into that.
```

iii.   The revised proposed designation does not include hearsay; it is testimony about what the witness did or didn't do. It is testimony about his actions. The information is relevant to rebut the Defendant's fourth affirmative defense that "Defendant treated Plaintiff the same as it treats non-pregnant employees who are similar in their ability or inability to work." (Doc. 9, p. 10). The testimony shows the Defendant made no effort to see how it treated the Plaintiff in comparison to other similarly

situated in their ability or inability to work. In the pretrial order,

the Defendant denied that it created positions for non-pregnant

employees or any employees. However, this testimony shows

the Defendant looks for work (i.e. creates work) for these

employees. Therefore, the testimony is relevant to defenses and

positions raised by the Defendant. Any potential prejudiced has

been addressed by the limiting stipulation concerning

transitional work reached by the parties in the final pretrial

conference held March 12.

f.   50:08-50:24

    i.   Defendant raised relevance and prejudice objections to this

      testimony which reads:

```
0 8 Was it Rural/Metro's practice then in 2015
0 9 to provide a light duty accommodation to someone who
1 0 had experienced an on-the-job injury?
1 1 A. If someone experienced an on-the-job
1 2 injury, traditionally that was something that was
1 3 offered an employee if restrictions would intersect
1 4 with an opportunity that we had available.
1 5 Q. And why was that the case? why would
1 6 someone with an on-the-job injury be allowed light
1 7 duty?
1 8 A. Well, I mean specifically depending on
1 9 whether they carried short-term or long-term
2 0 disability insurance they may choose to work up to
2 1 40 hours a week, their regular base wage, to have
2 2 some sort of income during this time. And it's
2 3 covered specifically under a transitional work
2 4 policy that we have.
```

    ii.   Per the Eleventh Circuit's mandate, issues relevant to proving

      pregnancy discrimination include showing that "Rural's policies

      that provide the basis for its rejection of Durham's request for

accommodation 'impose a significant burden on pregnant workers,' and that Rural's reasons for its policies failing to accommodate pregnant employees such as Durham 'are not sufficiently strong to justify the burden, but rather . . . give rise to an inference of intentional discrimination.'" *Durham v. Rural/Metro Corp.*, 955 F.3d 1279, 1287 (11th Cir. 2020). Therefore, Defendant's testimony that it has a policy of providing light duty to persons hurt on the job to permit them "some sort of income during this time" shows that the intent of the policy of accommodating those persons is to ease the financial burden on them created by their lifting restriction. This is relevant to comparing the burden placed on a pregnant employee, Ms. Durham. Also, the testimony rebuts the Defendant's fourth affirmative defense that "Defendant treated Plaintiff the same as it treats non-pregnant employees who are similar in their ability or inability to work." (Doc. 9, p. 10). Any potential prejudiced has been addressed by the limiting stipulation concerning transitional work reached by the parties in the final pretrial conference held March 12.

g.  52:14-53:23

    i.   Defendant objected on relevance and prejudice grounds to the

testimony of its corporate representative that he could not say

why the company's light duty policy accommodated one group

while not accommodating similarly situated pregnant

employees.

   ii.   The testimony reads:

```
1 4 Q. All right. My question might not have
1 5 been precise. Why would an on-the-job injury
1 6 qualify someone for light duty where if the
1 7 restriction was for a reason other than an
1 8 on-the-job injury light duty would not be an option?
1 9 A. So if I can clarify your question, you're
2 0 asking why someone with an on-the-job injury would
2 1 qualify for light duty versus someone who was
2 2 injured on a basketball court or something of that
2 3 nature?
2 4 Q. Or someone who has a lifting restriction
2 5 because they're pregnant.
0 1 A. Sure.
0 2 Q. This case.
0 3 A. I mean, specifically, there's no
0 4 requirement by policy to do that, to make that offer
0 5 to someone who was, in my example, hurt on a
0 6 basketball court versus someone who was hurt or
0 7 injured in their capacity working for the company.
0 8 Q. I hear that. And my question is more
0 9 fundamental. I'm going to use my example --
1 0 A. Sure.
1 1 Q. -- someone who has a lifting restriction
1 2 because they're pregnant. Why would Rural/Metro's
1 3 policy say we're going to allow light duty to
1 4 somebody who has an on-the-job injury and therefore
1 5 has a lifting restriction but someone with the same
1 6 lifting restriction who is pregnant isn't going to
1 7 get light duty?
1 8 MS. NORDSTROM: I'm going to object. I
1 9 don't think he testified to that. But you can
2 0 answer that question.
2 1 THE WITNESS: Yeah; I don't think I can
2 2 answer why the company would have made that
2 3 decision.
```

  iii.  The Eleventh Circuit's mandate clarifies the relevance of this

testimony by providing that Plaintiff can demonstrate that the

reason given for not accommodating her imposes a significant

burden on pregnant workers "and that Rural's reasons for its policies failing to accommodate pregnant employees such as Durham 'are not sufficiently strong to justify the burden, but rather . . . give rise to an inference of intentional discrimination.'" *Durham*, 955 F.3d at 1287. The remand an analysis where Durham could present evidence to a jury about the weaknesses of any reasons offered by Rural/Metro for its policy excluding pregnant workers. This testimony, showing that the company's representative could offer no reason is the type that the Eleventh Circuit anticipated could give rise to an inference of intentional discrimination. Any potential prejudiced has been addressed by the limiting stipulation concerning transitional work reached by the parties in the final pretrial conference held March 12.

h.  53:25-55:17

　　i.  Defendant objected to this testimony on relevance an prejudice grounds. The first part of the testimony is the corporate representative answering the question if he has any knowledge why the Defendant made a distinction between on-the-job

injuries and pregnancy. The Plaintiff adopts her analysis set out relating to page 50, line 8 to page 50, line 24.

ii.   The remainder of the testimony concerns whether the Defendant kept records of job openings in 2015 which is relevant to resolving the factual dispute between the parties as to whether there were open dispatch positions in 2015. The testimony reads:

```
2 5 Q. Do you have any knowledge as to why the
0 1 company would make a distinction between someone
0 2 with a limitation due to an on-the-job injury versus
0 3 someone with a limitation for another reason, such
0 4 as pregnancy?
0 5 A. I mean other than, you know, what's
0 6 required by local state and federal law, I do not
0 7 know. But that's, again, me speculating as to why
0 8 the company developed that policy.
0 9 Q. What sort of records did Rural/Metro keep
1 0 of job openings for 2015?
1 1 A. Records kept?
1 2 Q. Yeah. Would Rural -- did Rural/Metro --
1 3 and let me start: Did Rural/Metro keep any record
1 4 of what jobs would have been open in Alabama in
1 5 2015?
1 6 A. What may have existed is, in our
1 7 recruiting software called "ICIMS" -- literally
1 8 I-C-I-M-S -- which is a third-party tool, you may
1 9 have been able to find retired requisitions that
2 0 were open with associated candidates that would have
2 1 applied. But there was no formal process of, you
2 2 know, maintaining records of what was open, how long
2 3 it was open, and how many vacancies associated with
2 4 it.
2 5 Q. What is a requisition?
0 5 5 : 0 1 A. A requisition is simply just a posting of
0 2 an open vacancy for the company.
0 3 Q. Because statutes of limitations for hiring
0 4 claims can sometimes be two years was there any
0 5 practice in place of maintaining documentation
0 6 relating to open positions that were then filled for
0 7 a period of two years?
0 8 A. The practice going through interviews of
0 9 candidates, is that you're asking me?
1 0 Q. No.
1 1 A. Please ask me again.
1 2 Q. Sure.
1 3 What was the practice of maintaining
1 4 documents of -- reflecting open positions that were

1 5 then filled?
      6 A. I don't know of a specific practice that
```

20

**1 7** was held.

 i. 56:05-58:24

  i. Defendant objected to the following testimony as constituting

  hearsay (page 56, lines 10 to 21) and calling for a legal

  conclusion (page 56, line 17 to page 57, line 1):

```
0 5 Q. Well, in human resources would you agree
0 6 one of your jobs is to make sure that you are
0 7 looking out to ensure that actions in your area are
0 8 complying with federal and state employment laws?
0 9 A. I would agree with that.
1 0 Q. Okay. And those employment laws have a
1 1 period of time called a "statute of limitations"
1 2 where employees can bring a claim saying this law
1 3 was violated.
1 4 A. Uh-huh.
1 5 Q. Correct?
1 6 A. I agree with that.
1 7 Q. And generally those statute of limitations
1 8 run anywhere from 180 days to file an administrative
1 9 complaint up to two years, depending on whether it's
2 0 a tort claim or a hiring claim under 42 USC Section
2 1 1981. Correct?
2 2 MS. NORDSTROM: I'm going to object
2 3 because that calls for a legal conclusion.
2 4 You can answer if you know.
2 5 THE WITNESS: I can't answer that with
0 5 7 : 0 1 certitude.
0 2 BY MS. LEONARD:
0 3 Q. Okay. Well, generally wouldn't you be
0 4 responsible for knowing how long an employee would
0 5 have to bring a legal claim so that you would know
0 6 how long to keep documents?
0 7 A. In specific situations, yes.
0 8 Q. Okay. And what would those situations be?
0 9 A. Specifically it would pertain to hiring
1 0 employees and document maintenance associated with
1 1 that. But as it would pertain to anybody who was
1 2 not an employee I'm not familiar to the extent that
1 3 I could speak with authority.
1 4 Q. How long would you maintain document
1 5 maintenance for a current employee?
1 6 A. Seven years.
1 7 Q. Okay. Do you know if the practice would
1 8 be any different for documentation relating to open
1 9 positions or potential employees?
2 0 A. I do not know the answer to that.
2 1 Q. Do you know why the period of retention
2 2 was seven years?
2 3 A. Specifically, no.
2 4 Q. Is there a written document retention
2 5 policy that would reflect Rural/Metro's practices as
0 1 it related to retaining information for open
0 2 positions?
0 3 A. I do not recall that.
0 4 Q. Okay. Did you look to see if there was
0 5 such a document?
```

```
0 6  A. I have not looked.
0 7  Q. Has anyone looked to see if there's such a
0 8  document?
0 9  A. I don't know the answer to that.
1 0  Q. And the reason I'm getting down to this is
1 1  one of the claims Miss Durham had made is - Hey, I
1 2  wanted to go to some other positions. You're saying
1 3  that Mr. Crowell said there wasn't an open position
1 4  and I want to look to see if there are documents to
1 5  show if that's true or not. How can I find those
1 6  documents?
1 7  A. I don't think I know the answer to that
1 8  with certitude.
1 9  Q. Do those documents exist?
2 0  A. I don't know the answer to that.
2 1  Q. If those documents existed is there any
2 2  reason Rural/Metro would not still have them?
2 3  A. Again, I don't know the answer to that
2 4  either.
```

ii. The hearsay objection (56:10-21) is misplaced. This line of
questioning concerned the Defendant's document retention
practices, particularly focusing on how long the Defendant kept
information which could be relevant to employment litigation.
The witness is not being asked to testify to the truth of an out-
of-court unsworn statement. The witness, the Defendant's
corporate representative and an HR employee responsible for
ensuring actions in his are in compliance with federal and state
laws is asked about his knowledge of whether employment laws
have a statute of limitations.

iii. The legal conclusion objection (56:17-57:1) objection is also
misplaced. The Defendant's corporate representative states he
cannot answer what are specific statute of limitations "with
certitude," but later concedes in specific situations he is

responsible for knowing how long an employee would have to bring a legal claim so he would know how long to keep documents. He then identifies that employee records are kept for seven (7) years. In the context of this witness, the Defendant's corporate representative and an HR employee responsible for knowing federal employment law, the question is not asking for a legal conclusion but rather exploring the periods of time the Defendant keeps employment records and why (which is relevant to the spoliation issue the Plaintiff will present to the Court at the conclusion of the evidence for an adverse inference instruction).

j. 60:04-63:04

i. Defendant raised relevance and prejudice objections to page 60, lines 24-25 and objected to page 61, lines 3-10 as calling for a legal conclusion. The testimony at issue (going from page 60, line 20 to page 61, line 10) reads:

```
2 0 Q. Well, and, you would agree though in this
2 1 letter dated November 3rd, 2015 Miss Durham, through
2 2 my office, put Rural/Metro on notice that part of
2 3 her complaint was that she had been trying to get
2 4 transferred to dispatcher light duty or modified
2 5 duty assignment. Correct?
0 1 A. I understand that's the information in the
0 2 claim.
0 3 Q. All right. And through this letter
0 4 Rural/Metro then would have known that it should
0 5 have had a duty to preserve documents relating to
0 6 any open positions it may have had at that time.
0 7 MS. NORDSTROM: I'm going to object.
```

```
0 8 Q. Correct?
0 9 A. I'm sorry, I don't have the legal
1 0 expertise to answer that.
```

ii. The testimony at issue goes to whether the Defendant knew it should preserve evidence relating to open dispatch positions after receiving a letter from Plaintiff's lawyer putting the Defendant on notice of a potential legal claim and requesting it preserve evidence relevant to it. The earlier testimony from the witness about his job duties would permit a juror to conclude this is a question he should be able to answer. Because the question goes to the issue of why the Defendant did not preserve evidence relating to job openings (which is relevant to the dispute between the parties as to whether there are job openings), the testimony is relevant. Any prejudice through a reference to light duty is cured through the fact stipulation discussed at the final pretrial conference on March 12.

k. 99:08-105:6

i. This line of questioning concerns the Defendant's Equal Employment Opportunity Policy. Defendant raised foundation objections to page 99, line 20 to page 100, line 8, page 101, lines 12 to 18, and page 104, line 20 to page 105, line 1.

1. Page 99, line 20 to page 100, line 8 are a follow up question to the witness's answer to the question of what is the purpose of the EEO policy. In his answer, he makes a reference to "protected areas." (Doc. 86-2, p. 26-27, Depo Pages 99:12-19). The testimony to which the Defendant objects reads:

```
2 0 Q. And what are those protected areas?
2 1 A. And specifically as it relates to what's
2 2 in this document it describes race, color, religion,
2 3 sex, national origin, age, disability, marital
2 4 status, veteran status, sexual orientation or any
2 5 other basis prohibited by federal, state or local
1 0 0 : 0 1 laws.
```

Considering this witness's job is to be familiar with federal employment laws and the Defendant's EEO policy, and he was the one to use the phrase "protected areas," the necessary foundation has been laid for the question. The foundation is the witness's use of the phrase "protected areas" that catalyzed the follow-up question to clarify what the witness meant in using that term.

2. The testimony on page 101, lines 12 to 18 continues to explore that same topic, protected classes and is pursued in the context of knowing what is covered by the Defendant's EEO policy. The challenged testimony can

only be understood and analyzed in the context of its

surrounding testimony that extends from page 100, line

16 to page 101, line 23.

```
1 6 Q. Seeing as how part of your job was
1 7 enforcing the equal opportunity -- or -- Equal
1 8 Employment Opportunity Policy, wasn't part of your
1 9 job knowing what would be the "any other basis
2 0 prohibited by federal, state or local law or
2 1 ordinance"?
2 2 A. Yes.
2 3 Q. So what would that be?
2 4 A. I mean, it could be any number of things,
2 5 it's -- it's --
0 1 That is very broad.
0 2 Q. Tell me everything it can cover that you
0 3 know.
0 4 A. I'm sorry, say again.
0 5 Q. Tell me everything you understand it to
0 6 cover.
0 7 A. It could be anything that was published
0 8 after this handbook that has come out through a --
0 9 you know, to a protected class as recognized by the
1 0 federal government, the state, or local municipality
1 1 that the company may exist in.
1 2 Q. And that's what I'm asking you, is, what
1 3 are those protected classes?
1 4 MS. NORDSTROM: Same objection as to
1 5 foundation.
1 6 You can answer if you know.
1 7 THE WITNESS: I don't think I can answer
1 8 that.
1 9 BY MS. LEONARD:
2 0 Q. But wasn't it your job to know what those
2 1 were?
2 2 A. It is my job to either know or be able to
2 3 determine.
```

The foundation for the testimony in question is that the

witness is using the term "protected class" and the

follow-up questions are seeking to clarify what he meant

by using that term. Further, it is that the Defendant's

corporate representative was put up to testify to the

Defendant's policies, and his job is to know what is

covered by the  Defendant's EEOC policy. The question

highlights that the Defendant's own representative and

HR officer could not articulate

3.  The testimony on page 104, line 20 to page 105, line 1

reads:

```
2 0 Q. Okay. Is pregnancy a condition that is
2 1 protected under the Equal Employment Opportunity
2 2 Policy?
2 3 MS. NORDSTROM: Objection, foundation.
2 4 You can answer if you know.
2 5 THE WITNESS: I'd prefer to verify before
0 1 I answer.
0 2 BY MS. LEONARD:
0 3 Q. So you don't know whether pregnancy is
0 4 covered under Rural/Metro's EEO policy?
0 5 A. When we're talking about this policy I do
0 6 not see it listed.
```

The Defendant's corporate representative who was put up

to testify to the Defendant's anti-discrimination policies

in a pregnancy discrimination case where the Defendant

has raised a defense that it "maintained a policy

prohibiting discrimination in the workplace and a

procedure for the resolution of complaints alleging

discrimination (Doc. 9, p. 13, 15th Defense) should be

able to answer the question as to whether or not the

company's EEO policy covers pregnancy discrimination

without having to look at the policy. His answer, at a

minimum, shows a lack of familiarity as to what the

company's anti-discrimination policy prohibits as to

create questions of fact as it relates to the Defendant's

defense and show a reckless disregard for the protection

of a pregnant employee's rights.

ii. Defendant raised a hearsay objection to Page 103, line 9 to page

15. This testimony follows a line of questioning in which the

corporate representative has testified that the way he knows

what protected classes are is "either research and through

appropriate tools that were available to me as an HR

practitioner . . ." (Doc. 86-2, p. 28, Depo pages 101:24-102:05).

He is then asked to identify those tools. He goes on to testify

that they could include "any publications that would pertain to

changes in the EEOC opinions of HR practitioners that were

published after this document [meaning the EEO policy]." (Id.,

Depo pages 102:25-103:04). It is that context that he is asked

on page 103, lines 9 through 12  about the EEOC guidelines on

pregnancy discrimination which came out after the EEO policy.

When asked if he read those, he testified "[m]emory would say

I have at least read excerpts of that." (Doc. 86-2, Depo

Excerpts, p. 29, Depo page 103, lines 13-18). There is no out of

court statement offered for the truth of the matter asserted. The

witness is testifying to the tools he used to identify protected

classes. This is not hearsay.

    i.   Defendant contends the designation is incomplete and request

that page 105, lines 11 to 20 be included. The Plaintiff agrees

to include that designation if this Court overrules the

objections to this section designations.

l.  105:21-106:5

    i.  The Defendant's anti-discrimination policy does not

specifically identify pregnancy as something protected by the

policy. The Defendant objects to the Plaintiff exploring this

omission by raising relevance and prejudice objections. The

testimony reads:

```
2 1 Q. Okay. Do you know why pregnancy isn't
2 2 specifically among the different categories of
2 3 protected groups in paragraph one?
2 4 A. I would only have to be able to speculate.
2 5 Q. And what would that be?
0 1 A. That this document was authored before any
0 2 opinions that would have included pregnancy
0 3 discrimination.
0 4 Specifically related to the 2014 decision
0 5 by the EEOC.
```

   ii.  Testimony from the corporate representative concerning the

Defendant's policy prohibiting discrimination, its interpretation,

and its application are relevant to the issue of punitive damages

and the Defendant's Fifteenth Defense that it had a policy

prohibiting discrimination. Further, the testimony goes to

whether Defendant harbored a bias against pregnant employees by excluding them from protection under the policy and the witness's credibility because he later concedes that he was aware the PDA went into effect before the Defendant adopted its anti-discrimination policy, but the policy still does not reference pregnancy. (Doc. 86-2, p. 31, Depo pages, 107:07-19)

m. 106:7-112:1

    i. Defendant raised relevance and prejudice objections to the testimony on page 107 line 20 to page 112, line 1.[5] The testimony continues to explore the Defendant's anti-discrimination policy, its effectiveness, whether it covers pregnant employees, and how employees reading the policy would know whether or not it protected pregnant employees. Testimony from the corporate representative concerning the Defendant's policy prohibiting discrimination, its interpretation, and its application are relevant to the issue of whether the Defendant discriminated against the Plaintiff, punitive damages and the Defendant's Fifteenth Defense that rests on Defendant's

---

[5]    Due to the length of the testimony, the Plaintiff is not pasting it in the body of this response, but the testimony can be found at Doc. 86-2, docket pages 30-33.

policy prohibiting discrimination. There is no unfair prejudice to the Defendant in testimony relating to its anti-discrimination policy, the scope of its coverage, and the intellectual accessibility of the policy to the employees it is intended to protect.

ii. Further, despite its relevance objections, Defendant's own deposition designations encompass 107:20-108:1 (Doc. 87, p. 1, ¶ 2(e)). By designating that testimony, Defendant is conceding its relevance and lack of prejudice, at least to those lines.

n. 116:3-123:19

i. Defendant raised relevance and prejudice objections to the testimony on page 118, lines 5 through 20. Plaintiff will agree to withdraw those lines.

o. 128:15-132:6

i. Defendant raised relevance and prejudice objections to page 129, line 9 through 132, line 6. [6]

ii. This line of questioning explores whether there are differences "between the accommodations for qualified individuals with

---

[6] Due to the length of the testimony, the Plaintiff is not pasting it in the body of this response, but the testimony can be found at Doc. 86-2, docket pages 41-43.

disabilities and that Transitional Work Policy." (Doc. 86-2, Doc. Page 42, Depo page 129:16-19).[7]  The testimony then goes into the scope of the Transitional work policy and the reasons for its limits.[8] Per the Eleventh Circuit's mandate, issues relevant to proving pregnancy discrimination include showing that "Rural's policies that provide the basis for its rejection of Durham's request for accommodation 'impose a significant burden on pregnant workers,' and that Rural's reasons for its policies failing to accommodate pregnant employees such as Durham 'are not sufficiently strong to justify the burden, but rather . . . give rise to an inference of intentional

---

[7]     Defendant's first identified exhibit is its ADA policy. (Doc. 87, p. 2).
[8]     That portion of the testimony reads:

1 7 Q. Do you understand -- or -- do you have any
1 8 knowledge as to why the Transitional Work Program
1 9 Policy would only apply to someone with an
2 0 on-the-job injury versus somebody who might have
2 1 limitations due to a condition outside of work?
2 2 A. And, again, that simply is just the
2 3 policy. I don't know what the -- necessarily can
2 4 speak with authority on what the determining factor
2 5 was for the company but that is the policy which we
0 1 operate in.
0 2 Q. Is this policy still in effect today?
0 3 A. Where applicable, yes. Either this or
0 4 some resemblance of it. AMR has its own set of risk
0 5 and safety policy. But where applicable this policy
0 6 would be maintained. Or something similar to it.

(Doc. 86-2, Depo Excerpts, Docket page 43, Depo pages 131:17-132:06)

discrimination.'" *Durham v. Rural/Metro Corp.*, 955 F.3d 1279, 1287 (11th Cir. 2020). The testimony is relevant to comparing the burden placed on a pregnant employee, Ms. Durham. Also, the testimony rebuts the Defendant's fourth affirmative defense that "Defendant treated Plaintiff the same as it treats non-pregnant employees who are similar in their ability or inability to work." (Doc. 9, p. 10). Any potential prejudice has been addressed by the limiting stipulation concerning transitional work reached by the parties in the final pretrial conference held March 12.

p.  134:24-138:21

   i. Defendant raised relevance and prejudice objections to page 134, lines 24-21.[9] This testimony focuses on contents of the Defendant's handbook, an exhibit that both parties have on their exhibit lists. The testimony covers the Defendant's complaint procedure which the Defendant has put at issue through its Fifteenth and Sixteenth Defenses. (Doc. 9, p. 13).

---

[9]      It is not clear on which page the line 21 falls with respect to the Defendant's objection. Plaintiff is assuming it is page 138, line 21. Due to the length of this testimony, the Plaintiff is not pasting it in this document, but it can be found at Doc. 86-2, docket pages 43-45.

The testimony is relevant to the issues to be resolved by the jury.

ii. Defendant argues the testimony is incomplete and should include the testimony y on pages 138, lines 22 through page 139, line 1 that the witness had not received a complaint of pregnancy discrimination. Plaintiff objects to the inclusion of this testimony because it is risks misleading the jury and should be excluded under Rule 403 of the Federal Rules of Evidence. During the events relevant to Ms. Durham's charge, the witness (Eric Morris) did not have responsibility for the geographic area in which she worked. His testimony about his personal experience in places and times not relevant to Ms. Durham's claims is not probative on the issue of whether she experienced discrimination and could leave the false impression that there were not complaints.[10]

q. 143:14-149:23

i. Defendant raised relevance and prejudice objections to page 143, line 22 to page 145, line 14. Plaintiff does not concede

---

[10] Defendant's supplemental interrogatory answers identified two gender discrimination EEOC Charges in 2014 in the Florida/Alabama/Georgia area. This exhibit is Plaintiff's trial exhibit 22 ("may use" category). The proposed testimony by Defendant would require Plaintiff to use exhibit 22 to rebut the inference..

those objections, but in reviewing the testimony, it appears to be repetitive of testimony contained in earlier designations, so the Plaintiff will withdraw from designation page 143, line 22 to page 145, line 15 in the spirit of efficiency.

r.  152:12-20

Defendant raised relevance and prejudice objections. Plaintiff does not concede those objections, but in reviewing the testimony, it appears to be repetitive of testimony contained in earlier designations, so the Plaintiff will withdraw the designation.

s.  181:2-183:23

Defendant raised relevance and prejudice objections. Plaintiff does not concede those objections, but in reviewing the testimony, it appears to be repetitive of testimony contained in earlier designations, so the Plaintiff will withdraw the designation.

t.  183:25-198:09[11]

    i.  Defendant raised hearsay objections to:

        1.  185:3-186:19

---

[11]     Due to this designation covering 15 deposition pages, the Plaintiff is not pasting the specific portions in this response. The testimony can be found at Doc. 86-2, Docket pages 54-63.

a. This testimony involves the Defendant's corporate representative being examined on the Defendant's response to the Plaintiff's notice of claim/preservation of evidence letter. The witness is asked if he disagrees with any of the factual statements in the first paragraph of the letter and him responded that he could not verify the dates but it sounded like a correct chronology of events. This testimony is not hearsay; it is the witness being shown an exhibit and being given an opportunity to identify what portions of the document the Defendant disputes.

2. 191:18-195:10

a. This testimony involves the Defendant's corporate representative being examined on the Defendant's response to the Plaintiff's notice of claim/preservation of evidence letter. The witness is asked if Rural/Metro disputed that the representations in the letter about what was said by Mr. Crowell to Plaintiff when she sought

36

accommodation due to her pregnancy. This testimony is not hearsay; it is the witness being shown an exhibit and being given an opportunity to identify what portions of the document the Defendant disputes. Further, the testimony encompasses questioning about whether Defendant was put on notice as of the date of that letter that the Plaintiff considered herself to have been constructively discharged. Defendant's subsequent action in response to this letter is relevant to issues to be resolved in this case.

ii.  Defendant raised relevance and prejudice objections to:

1. 186:11-19

   Plaintiff agrees to withdraw this designation without conceding the objection and withdraws lines page 186, 20-25 as well.

2. 187:2-189:5

   This line of questioning sought to identify persons similarly situated to Plaintiff in their ability to work (lifting restrictions) that were accommodated with light

or modified duty. This relates to the Plaintiff's showing that a burden was placed on pregnant employees that was not placed on similarly situated employees, and the Defendant's fourth defense that "[a]t all times, Defendant treated Plaintiff the same as it treats non-pregnant employees who are similar in their ability or inability to work." (Doc. 9, p. 10)

3.  189:25-192:10

    This line of questioning related to the Defendant losing and not being able to locate comparator documents. It is relevant to the issue of spoliation and showing the jury why the Plaintiff cannot present them with more comparator information.

4.  194:9-195:10

    This testimony asks the Defendant's corporate representative that as of the date the company got Plaintiff's lawyer's letter, the company was on notice that Plaintiff thought she had been fired since she was not being allowed to return to work. This is relevant to the

issue of whether the Plaintiff was constructively

discharged.

u.  218:2-226:8

    i.  Defendant raised relevance and prejudice objections.[12]  The

witness was shown the Plaintiff's EEOC Charge and asked to

identify any facts that were disputed. This testimony identifies

the facts which the Defendant's corporate representative did not

dispute. Because it goes to identifying the areas of

disagreement, it is relevant to the Plaintiff's pregnancy claim

and evaluating the credibility of any evidence offered by the

Defendant which could dispute facts the corporate

representative did not. It highlights Defendant's inaction to the

Plaintiff's complaints of discrimination. The testimony ends

with the witness conceding that part of his job is to ensure

employees did not experience discrimination based on

pregnancy and that would "mean being able to identify what

constitutes pregnancy discrimination." This is relevant to

weighing the credibility of his earlier testimony.

v.  230:22-232:10

---

[12]  Due to the number of pages in this designation, the testimony is not being pasted into this document. The testimony can be found at Doc. 86-2, Docket pages 67-72.

    i.   Defendant objected to page 232, lines 7-10 on relevance and

prejudice grounds. The testimony concerns the Defendant's

failure to keep records of persons given light duty after being

advised by the EEOC to keep payroll and personnel records.

    ii.   The testimony, in the context of page 231, line 14 through page

232, line 10 reads:

```
1 4 Q. And if we look to the second page of the
1 5 notice there's a section that says "Preservation of
1 6 Records Requirement: EEOC regulations require
1 7 respondents to preserve all payroll and personnel
1 8 records relevant to the charge until final
1 9 disposition of the charge or litigation."
2 0 Would you agree that through this notice
2 1 Rural/Metro was being told by the EEOC that it had
2 2 an obligation to maintain the documents relevant to
2 3 Miss Durham's claims?
2 4 A. Well, I mean, when you're talking about
2 5 payroll and personnel records you're making the
2 3 2 : 0 1 assumption that personnel records would be including
0 2 open requisitions and postings of requisitions.
0 3 Q. No, no, no. My question is: Would you
0 4 agree through this that the EEOC was telling them
0 5 you need to keep payroll and personnel records?
0 6 A. Yes.
0 7 Q. Okay. But yet Rural/Metro didn't keep the
0 8 records of people who had been given light duty in
0 9 Alabama at that time, did they?
1 0 A. Not to my knowledge.
```

Plaintiff adopts her arguments above that this goes the

spoliation issue and her inability to obtain information on all

persons who received light duty due to the Defendant's failure

to keep those documents.

w. 232:16-233:22

Defendant objected to page 232, line 19 to page 233, line 22. Plaintiff

does not concede the objections, but because the testimony appears to

be repetitive of earlier issues, the Plaintiff agrees to withdraw the

designations for page 232, line 19 to page 233, line 22

x.  238:15-240:2

    i.  The Defendant,[13] after receiving the Plaintiff's notice of

        claim/preservation of evidence letter and EEOC Charge,

        reported to the Alabama Department of Labor in opposition to

        Plaintiff's unemployment benefits application that the Plaintiff

        was "an active-full time employee, and there has not been any

        change in the claimant's work hours." (Plaintiff's Proposed

        Exhibit 13). Defendant has objection to the testimony on page

        239, lines 18 to 21 as hearsay. Plaintiff does not agree the

        testimony on page 239, lines 18 to 21 is hearsay, but will

        withdraw the designation for page 239, lines 18 to 21

        nonetheless.

y.  259:14-260:18

    i.  Defendant raised relevance and prejudice objections to this

        testimony that involves the Defendant's corporate

        representative who helped answer the Defendant's

---

[13]    The evidence will show Minda Reaves supplied the information to the third party vendor handling the response to the unemployment claim because she was the one who received the email requesting the information and her duties typically encompassed providing this information.

interrogatories being asked about the Defendant's response to Plaintiff's interrogatory 9.[14]  Because the Defendant has put this interrogatory answer at issue by identifying it on its exhibit list, the testimony should be permitted. Further, the interrogatory sought to identify comparators, and the Defendant's response was it lacked sufficient information to answer. For the reasons stated above, the answer to this interrogatory, or more importantly, the Defendant's inability to answer the interrogatory is relevaent.

z.  268:6-273:6

    i.  Defendant objected to page 272, line 19 to page 273, line 6 which concerns the Defendant's responses to Plaintiff's second interrogatories that asked the Defendant to identify persons who complained of gender discrimination. As stated above, this information could be relevant if the Defendant argues it (or Mr. Morris) did not receive any complaints of discrimination. Plaintiff will withdraw this designation unless it becomes

---

[14]    Defendant has identified its response to Plaintiff's interrogatory nine as exhibit 11 on its exhibit list. (Doc. 87, p. 3).

necessary to use it and the related interrogatory responses as

rebuttal evidence.

Respectfully submitted,

/s/ Heather Newsom Leonard
Heather Newsom Leonard

OF COUNSEL:

HEATHER LEONARD, PC
2105 Devereux Circle, Suite 111
Birmingham, AL 35243
(205) 977-5421 – voice
(205) 278-1400 – facsimile
Heather@HeatherLeonardPC.com

# CERTIFICATE OF SERVICE

I certify that on March 12, 2021 I served a copy of this filing on the counsel of record listed below using this Court's electronic filing system:

Heidi Wilbur
Steven W. Moore
FOX ROTHSCHILD, LLP
1225 17th Street, Suite 2200
Denver, CO 80202

Tammy C. Woolley
CONSTANGY BROOKS SMITH & PROPHETE, LLP
Two Chase Corporate Drive
Suite 120
Birmingham, AL 35244

/s/ Heather Newsom Leonard
OF COUNSEL